ARDEN G. GUYER and CAROLYN GUYER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Guyer v. Commissioner
Docket Nos. 12778-82, 13289-82, 13290-82, 13291-82, 13292-82.
United States Tax Court
T.C. Memo 1985-210; 1985 Tax Ct. Memo LEXIS 423; 49 T.C.M. (CCH) 1376; T.C.M. (RIA) 85210; May 1, 1985. James Prince, for the petitioners in docket *425 No. 12778-82. James Holloman, Jr., for the petitioners in docket Nos. 13289-82, 13290-82, 13291-82, and 13292-82. Juandell D. Glass, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in Federal income tax and additions to tax as follows: Tax Year
[2]Sec. 6653(a) Docket No.
Petitioner
Ended
Deficiency
Addition to Tax
12778-82
Arden G. and
12/31/77
$36,154.67
Carolyn Guyer
13289-82
Jack Hodges
6/30/77
56,429.71
Trucking Co.
13290-82
Bill Hodges
6/30/77
883,602.32
Truck Co., Inc.
13291-82
Harold L. and
12/31/76
16,910.00
Judy L. Hodges
12/31/77
311,538.00
13292-82
Bill Hodges
6/30/78
790,990.00
$39,550.00
Truck Co., Inc.
By agreement of the parties and by order of the Court, these cases were consolidated for trial, briefing and opinion. After concessions by the parties, the following issues remain: (1) whether petitioners Arden and Carolyn Guyer and Harold and Judy *426 Hodges realized taxable dividend income as a result of certain distributions following the incorporation of Arden Drilling Company; (2) whether petitioners Arden and Carolyn Guyer realized a constructive dividend as a result of the payment by Arden Arilling Company of certain air travel expenses incurred by Arden Guyer; (3) what is the arm's length rental charge under section 482 for certain equipment leased from petitioner Jack Hodges Trucking Company to petitioner Bill Hodges Truck Company; (4) whether, in computing its gain on sale of certain assets, petitioner Bill Hodges Truck Company is entitled to use bases in excess of pre-existing book values of those assets acquired pursuant to the purchase and liquidation of a corporation; and (5) whether amounts advanced to co-petitioner Harold Hodges from Bill Hodges Truck Company constituted loans or constructive dividends. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Arden G. Guyer (Guyer) and Carolyn Guyer resided in Edmond, Oklahoma, at the time they filed their petition herein. They filed *427 a joint income tax return for the calendar year 1977 with the Internal Revenue Service Center in Austin, Texas. Petitioners Harold L. Hodges (Hodges) and Judy L. Hodges resided in Oklahoma City, Oklahoma, at the time they filed their petition herein. They filed joint income tax returns for the calendar years 1976 and 1977 and an amended income tax return (Form 1040X) for the calendar year 1976 with the Internal Revenue Service Center in Austin, Texas. Petitioner Jack Hodges Trucking Company (JHTC) is a corporation, and its legal address was Oklahoma City, Oklahoma, at the time it filed its petition herein. It filed a corporation income tax return for the taxable year ended June 30, 1977. Before December 15, 1976, JHTC was known as J.D. Hodges Trucking Company, Inc. JHTC and its predecessor shall hereinafter be collectively referred to as "JHTC." Petitioner Bill Hodges Truck Company (BHTC) is a corporation, and its legal address was Oklahoma City, Oklahoma, at the time it filed its petition herein. It filed corporation income tax returns for the taxable years ended June 30, 1977, and June 30, 1978. Distributions From Arden Drilling Company
In 1973, co-petitioners *428 Guyer and Hodges organized Arden Drilling Company as an Oklahoma partnership (Arden Partnership) engaged in the drilling of oil and gas wells. Guyer owned a 49 percent interest and Hodges owned a 51 percent interest in Arden Partnership. It was the policy of Arden Partnership to distribute excess funds to the partners as long as the distributions would not impair cash flow needed for operations. In late 1976, Guyer and Hodges attempted to obtain a larger line of credit for Arden Partnership. Guyer and Hodges met with Forrest Jones (Jones), a loan officer of Fidelity Bank (Fidelity), which maintained Arden Partnership's existing line of credit. During the discussions, Jones indicated that increasing Arden Partnership's line of credit would necessitate participation by an additional financial institution and that he had contacted Republic Bank (Republic) for this purpose. Jones further indicated that Republic desired that Guyer and Hodges incorporate the operations of Arden Partnership. The amount of initial capital to be contributed to the proposed corporation thereafter became the subject of the discussions with Jones. According to Jones, Fidelity required that at least $250,000 *429 of the capital of Arden Partnership be contributed to the new corporation. Guyer and Hodges intended, at the time of the meetings with Jones, to distribute to themselves the amount of capital exceeding $250,000. Harold Holmes (Holmes), a Certified Public Accountant, also attended Guyer and Hodges' meetings with Jones. Holmes performed accounting and tax advisory services for Hodges before the organization of Arden Partnership and continued to perform those services for Arden Partnership after its formation. In December of 1976, Holmes related the substance of the meetings with Jones to Harold Hines (Hines), an attorney who worked with Holmes in serving as business and tax counsel to Arden Partnership. Hines prepared the documents necessary for organization of Arden Drilling Company as an Oklahoma corporation (Arden Corporation). These documents included the Articles of Incorporation, dated December 31, 1976, and authorizing the issuance of 250,000 shares of $1.00 par value common stock. Hines also prepared a document entitled "SUBSCRIPTION TO COMMON SHARES OF ARDEN DRILLING COMPANY," dated January 3, 1977. That document stated that Guyer and Hodges offered to subscribe for *430 the 250,000 shares of authorized common stock of Arden Corporation, with Guyer receiving 122,500 shares and Hodges receiving 127,500 shares. The document further provided that Guyer and Hodges' subscription for the shares was "in exchange for the transfer of assets of Arden Drilling Company, a partnership, as set forth in Exhibit 'A' attached hereto and made a part hereof." Exhibit "A" of the document was entitled "SCHEDULE OF ASSETS AND LIABILITIES ASSUMED OF ARDEN DRILLING COMPANY, A PARTNERSHIP, TRANSFERRED TO ARDEN DRILLING COMPANY, A CORPORATION, IN EXCHANGE FOR 250,000 SHARES OF COMMON CAPITAL STOCK." Exhibit "A" contained two schedules, one entitled "Description of Assets Transferred as of 1/1/77" and the other entitled "LIABILITIES ASSUMED AS OF JANUARY 1, 1977." The first schedule listed each asset, including "Receivables" of $352,751.78, as reported in Arden Partnership's unaudited balance sheet as of December 31, 1976, prepared by Holmes. The schedule reported "Net Book Value of Assets Transferred" totaling $3,386,684.03. The second schedule listed liabilities totaling $2,937,998.72, as reported in Arden Partnership's balance sheet. Immediately below the second schedule, *431 the last line of Exhibit "A" indicated "Net Book Value of Assets Transferred Less Liabilities Assumed" of $448,685.31. This last figure corresponded with the amount reported as "Total Capital" in Arden Partnership's December 31, 1976 balance sheet. Hines obtained all of the figures used in preparing Exhibit "A" from that balance sheet. On or about January 3, 1977, Guyer and Hodges transferred all of the assets of Arden Partnership to Arden Corporation in exchange for 250,000 shares of common stock of Arden Corporation. Prior to the transfer, Arden Partnership was not indebted to Guyer or Hodges. The transfer of assets was not restricted in any manner, and Guyer and Hodges received no debt of Arden Corporation in connection with the transaction. Arden Partnership did not make a distribution to its partners prior to the transfer of its assets to Arden Corporation for two reasons. First, a distribution at that time would have impaired the working capital needed for operation of the business. Second, Republic objected to any distribution from the business to its owners until the business realized better operating results. The in-house bookkeeper for Arden Partnership and Arden *432 Corporation did not record the transfer of the assets of Arden Partnership and the issuance of shares of Arden Corporation at the time the transaction occurred. The bookkeeper instead simply maintained the financial records after the transaction in the same manner as before the transaction. The bookkeeper prepared balance sheets of "Arden Drilling Company" dated January 31, 1977, and February 28, 1977, which in the "Capital" section reported "Capital Stock" of $250,000 and "Paid in Capital" of $196,144.75. The same bookkeeper had prepared a balance sheet of "Arden Drilling Company" dated December 31, 1976, which contained "capital" accounts entitled "Arden G. Guyer" and "Harold L. Hodges." On September 30, 1977, the bookkeeper made an entry in the financial records, the stated purpose of which was to "[a)djust to transfer from Partnership to Corporation." The entry consisted of debits to "Capital-Guyer" and "Capital-Hodges" in the amounts of $217,513.17 and $228,631.58, respectively, and credits to "Capital Stock," "Stockholders Advances-Guyer," and "Stockholders Advances-Hodges" in the amounts of $250,000, $95,013.17, and $101,131.58, respectively. Between September 30, 1977, and *433 December 31, 1977, Arden Corporation distributed to Guyer and Hodges the amounts credited on September 30, 1977, to "Stockholders Advances-Guyer" and "Stockholders Advances-Hodges," respectively. The audited financial statements of Arden Corporation reported net income for the year ended December 31, 1977, of $286,479. With its income tax return for the year 1977, Arden Corporation filed a statement entitled "STATEMENT UNDER [Income Tax] REGS. 1.351-3(b)." The statement contained a list of property received from Arden Partnership on January 3, 1977, which corresponded with the list contained in the first schedule of Exhibit "A" to the subscription offer prepared by Hines. The statement also provided that, in connection with the transfer, Arden Corporation assumed liabilities of Arden Partnership totaling $3,136,684.03. In their respective income tax returns for the year 1977, petitioners Guyer and Hodges did not report as income any portion of the amounts credited to "Stockholders Advances" on September 30, 1977, and distributed thereafter. Respondent determined that petitioners realized dividend income of $97,355.65 and $101,329.35, respectively, in connection with the transaction. *434 In their petition filed with this Court, petitioners Hodges asserted the following as a fact upon which they relied: (b) The alleged distribution from Arden Drilling Company, a corporation, was in fact, the payment of a loan by the Company to the Petitioner created upon incorporation of the Company because the transferring partnership did not transfer that portion of its accounts receivable to the Company in excess of that amount necessary for the Company to have $250,000 in capital stock. In their petition filed with this Court, petitioners Guyers alleged the following as facts upon which they relied: (e) On January 3, 1977, Petitioner, Arden G. Guyer, and his partner in Arden Drilling Company transferred their partnership interests to Arden Drilling Company, a newly formed corporation (the "Corporation"). At the time the Corporation was formed, it was determined, pursuant to incorporation planning meetings, that the amount of total capital required to be contributed to adequately capitalize the Corporation was $250,000. To the extent that the aggregate balance of the Partnership capital accounts exceeded $250,000, a distribution from the Partnership to the partners was *435 to be made. It was further determined that the Petitioner, Arden G. Guyer, was to receive an interest in the Corporation in proportion to his interest in the Partnership. Petitioner, Arden G. Guyer, thus transferred his forty-nine percent (49%) interest in the Partnership in exchange for stock of the Corporation with a par value equal to $122,500. (f) In addition to the net assets in the amount of $250,000 required to adequately capitalize the Corporation, the Partnership owned accounts receivable of $198,685. The value of these receivables was to be distributed to the Partners of the Partnership. The receivables were transferred to the Corporation for collection purposes. (g) The accounts receivable, upon collection by the Corporation, were repaid to the partners, with Petitioner, Arden G. Guyer, receiving forty-nine percent (49%) thereof, or $97,355.65. (h) Said payment to Petitioner, Arden G. Guyer, upon collection was repayment of a liability owed to him by the Corporation, and thus did not constitute a dividend to him. Guyer Constructive Dividend
In November of 1977, co-petitioner Guyer traveled by airplane to Indianapolis to discuss with a representative of ITT *436 [3] the possible acquisition of Arden Corporation by ITT. Guyer and the representative negotiated for approximately 2 hours, without discussing the form of the potential acquisition, before deciding not to engage in the transaction. Guyer then returned to Oklahoma City. Guyer utilized a charter jet service for the trip to and from Indianapolis. Arden Corporation paid the service's fee of $2,401.92. Respondent determined that the payment made by Arden Corporation was for Guyer's benefit and was therefore taxable to petitioners as a dividend under sections 301 and 318. Arm's Length Rent
During the years 1976 through 1978, Hodges owned 100 percent of the stock of petitioner BHTC, a corporation engaged in the oil field trucking business. Hodges was president of and exercised control over the day-to-day operations of BHTC. On December 15, 1976, BHTC purchased 100 percent of the stock of petitioner JHTC, a corporation also engaged in the oil field trucking business, from Hodges' brother, J. D. Hodges. The purchase agreement provided that BHTC would receive "[p]ossession *437 of the assets" of JHTC at 12:01 A.M. on the day of closing. JHTC and BHTC executed an equipment lease contract in which JHTC agreed to lease to BHTC certain "motor vehicle equipment." Appendix "A" to the contract listed the equipment covered by the contract as 32 "tractors" or "truck tractors." Under the contract, BHTC agreed to pay JHTC "50% of gross revenue" from the leased equipment. BHTC also agreed to pay all "over-the-road operating expenses" of the equipment, including expenses for drivers, fuel, maintenance, and most taxes, licenses, and other assessments. JHTC agreed to pay ad valorem taxes on and the basic license and registration fees for the equipment. The equipment lease contract provided that the agreement "shall extend for the term of one year from and after the effective date hereof," unless canceled or renewed. The effective date of the contract was February 17, 1977, and the contract contained no reference to any leasing arrangement between JHTC and BHTC existing before that date. The contract further provided that "this contract contains all of the agreements between the parties hereto * * *." During the fiscal years ended June 30, 1977, and June 30, 1978, BHTC *438 accrued and paid to JHTC rents of $988,710 and $1,707,643, respectively. Equipment leases in the oil field trucking industry typically require that the lessor pay all driver, fuel, and maintenance costs. Under such typical industry leases, the rent payable to the lessor is 70 percent of the gross revenue generated by the leased equipment. The sum of driver, fuel, and maintenance expenses typically equals 50 to 55 percent of the gross revenue from the equipment. In statutory notices of deficiency, respondent determined that the fair market rental values of the assets leased to BHTC for the period February 17, 1977, through June 30, 1977, and for the year ended June 30, 1978, were $136,620 and $409,860, respectively. He therefore reallocated taxable income between JHTC and BHTC to reflect these amounts. Gain on Sale of Assets
On March 14, 1974, petitioner BHTC purchased for $200,000 all of the stock of Jerry Pinkley Transports, Inc. (Pinkley) from an unrelated party. Pinkley was merged into BHTC on August 19, 1974. Under the merger agreement, BHTC acquired all of Pinkley's assets and assumed all of Pinkley's liabilities, and Pinkley ceased its separate existence. *439 BHTC reported the acquisition of Pinkley for Federal income tax purposes as a tax-free reorganization. Thus, on its income tax returns prepared by Holmes for the fiscal years ended June 30, 1975, and June 30, 1976, BHTC used as its bases in the assets acquired from Pinkley the adjusted bases reported by Pinkley as of August 19, 1974. Holmes prepared Pinkley's final Federal income tax return for the period June 1, 1974, through August 19, 1974. On that return, Pinkley did not report depreciation or investment tax credit recapture. On October 1, 1976, BHTC sold a portion, but not all, of the assets acquired from Pinkley. On its Federal income tax return for the fiscal year ended June 30, 1977, BHTC reported a loss on the sale of those assets of $52,884. BHTC attached the following "Note" to that income tax return: The taxpayer sold, in the year ended June 30, 1977, certain assets which had been acquired through purchase and liquidation of a subsidiary. The excess of cost over the basis of these assets was held in an Investment in Subsidiary account.Upon sale of these assets the remaining book value and the Investment in Subsidiary exceeded the total consideration paid by $15,000. *440 Respondent determined that BHTC realized a gain of $147,115 on the sale of the assets on October 1, 1976, because BHTC failed to substantiate a proper allocation of the amount paid in excess of book value of the assets acquired from Pinkley at the time of acquisition. Prior to trial, petitioner BHTC engaged Randel T. Dunn (Dunn), who prepared BHTC's tax return for the fiscal year ended June 30, 1977, to compute the gain or loss for Federal income tax purposes realized by BHTC upon the sale of assets on October 1, 1976. Dunn made the computation on work sheets prepared by BHTC's attorney. In those work sheets Dunn computed a net gain of $25,821, equal to an amount realized of $185,000 less adjusted bases aggregating $159,179. Dunn concluded that the acquisition of the Pinkley stock by BHTC followed by the merger of Pinkley into BHTC constituted a transaction described in section 334(b)(2) and that BHTC's initial bases in the assets acquired from Pinkley should have been determined pursuant to that section. Therefore, as an initial step in his computation of gain on the sale, Dunn allocated the aggregate purchase price of Pinkley among the acquired assets, in proportion to what *441 Dunn listed as the values of the assets as of May 1974. With minor exceptions, Dunn obtained the listed asset values from various appraisals; the authors of the appraisals did not testify at trial, and the appraisals are not in evidence. Hodges Constructive Dividend
Co-petitioner Hodges frequently withdrew funds from BHTC for his personal use or use in other businesses, and BHTC paid a number of Hodges' personal expenses and allowed Hodges free use of certain corporate property. The aggregate amounts of such transactions were $54,562.62 and $287,018.89 during the years 1976 and 1977, respectively. Of these amounts, BHTC charged $22,848 during 1976 and $217,895.55 during 1977 to "Accounts Receivable Officer - Harold L. Hodges." In December of 1977, BHTC credited the account receivable for $50,000, the amount of a bonus payable to Hodges. Respondent determined that petitioners realized taxable dividend income of $54,562.62 for 1976 and $237,018.89 for 1977 as a result of the above transactions. Petitioners have conceded respondent's adjustments to the extent that BHTC did not charge the advances and other payments to the account receivable ($31,714.62 for 1976 and $69,123.34 *442 for 1977). OPINION Each of the issues to be decided is primarily factual. As to each the burden of proving respondent's determination incorrect rests upon petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Distributions From Arden Drilling Company
On January 3, 1977, co-petitioners Guyer and Hodges transferred the assets of Arden Partnership to Arden Corporation in a transaction qualifying for nonrecognition treatment under section 351. [4] Petitioners argue that distributions to Guyer and Hodges from Arden Corporation during the last 3 months of 1977 did not constitute taxable dividends but were payments in satisfaction of a liability owed Guyer and Hodges by Arden Corporation. Petitioners apparently contend that this alleged liability existed either because Guyer and Hodges transferred to Arden Corporation only sufficient assets to provide the corporation with $250,000 of capital or because Arden Partnership became indebted to Guyer and Hodges immediately before the transfer and thus possessed only $250,000 of capital at the time of the transfer. *443 We have carefully considered the evidence presented by petitioners, which consisted primarily of the testimony at trial of Holmes, Hines, and co-petitioners Guyer and Hodges. Petitioners' evidence demonstrates only that, at the meetings with Jones, Guyer and Hodges intended to distribute from Arden Partnership any capital in excess of $250,000 before forming the corporation. The evidence does not indicate that Guyer and Hodges had such an intention at the time of the transaction or that they actually effected their initial intention. This latter failure in petitioners' proof is fatal because the resolution of this issue depends "not upon what might have been done but rather upon what in substance actually was done." Gus Russell, Inc. v. Commissioner,36 T.C. 965, 968 (1961). Cf. Cornelius v. Commissioner,494 F.2d 465, 471 (5th Cir. 1974), affg. and quoting 58 T.C. 417, 422 (1972). We believe that the subscription offer prepared by Hines and dated January 3, 1977, reflects what actually was done in the present case. Exhibit "A" of that document indicates that Guyer and Hodges transferred all of the assets of Arden Partnership *444 to Arden Corporation and that the liabilities of Arden Partnership at the time of the transfer did not include any liability to Guyer or Hodges. Petitioners ask us to ignore the subscription offer because the document was not signed by Guyer or Hodges and because the offer was conditional upon acceptance by the board of directors of Arden Corporation, and "[n]o evidence has been represented [sic] that such subscription offer was accepted." We look to the subscription offer not as evidence that the terms of the offer constituted a binding contract between petitioners and Arden Corporation but as evidence of what actually transpired in the transaction in issue. Regardless of whether Guyer and Hodges signed the document [5] and whether the board of Arden Corporation formally accepted the offer, [6] on January 3, 1977, Guyer and Hodges transferred the assets of Arden Partnership to Arden Corporation in return for 250,000 shares of common stock. The contemporaneous written subscription offer, prepared by Arden Partnership's attorney, constitutes the most reliable evidence of what occurred that is available to us. *445 Hines testified that his purpose in preparing Exhibit "A" of the subscription offer was only "[t]o show that the book value of the assets exceeded the book value of the liabilities in order to avoid a tax consequence on the 351 exchange." (See section 357(c).) We find Hines' testimony on this issue incredible and entitled to little weight, in light of the express terms of the subscription offer and the express title of Exhibit "A." Moreover, one need only cursorily examine the December 31, 1976 balance sheet, prepared by Holmes and from which Hines obtained the figures used in Exhibit "A," to ascertain whether Arden Partnership had liabilities in excess of basis on the date of the transfer. Finally, Hines himself admitted on cross-examination that the true purpose of Exhibit "A" was to show the assets transferred to and the liabilities assumed by Arden Corporation. Guyer, Hodges, Holmes, and Hines all testified that Guyer and Hodges intended to establish Arden Corporation with only $250,000 of capital and to distribute any excess capital to themselves as partners in Arden Partnership. Only in the context of the meetings with Jones, however, did the witnesses testify with specificity *446 regarding Guyer and Hodges' intentions. The evidence does indicate that, upon learning from Jones that Fidelity required a minimum capitalization of $250,000, Guyer and Hodges intended to distribute any capital in excess of that amount. The evidence also indicates, however, that the need for operating capital prevented a distribution from Arden Partnership before the asset transfer. As Holmes testified: Q. Mr. Holmes, do you know why the excess capital, and I'm referring to the amount in excess of $250,000.00, was not distributed at the end of 1976? A. Because if they had made a distribution at that particular time the capital, the operating capital, the current assets of the company would have been impaired to the point where they would have had problems operating. Moreover, Hodges stated that Republic would not allow a distribution from the business until operating results improved: Q. What were the discussions leading up to that decision with Mr. Jones or Mr. Holmes? A. All that I recall is that we needed $250,000.00 to put in as capital to incorporate, and the rest of the monies would be split between Arden [Guyer] and I. Q. Was there any objection raised *447 by Fidelity Bank or any other lending institution with respect to that? A. Yes. The Republic Bank in Dallas wanted the entire amount of money left in the company for a period of time until we showed better response and better results in the company. Q. How was that request by them resolved finally? A. Well, six or seven months, eight or nine months after that, less than a year, then they said it would be all right to disburse the extra monies. It may have been possible for Guyer and Hodges to establish a liability payable to them from Arden Partnership before the transfer to Arden Corporation or to withhold certain assets from the transfer. On the record before us, however, there is no evidence indicating that they effected the transfer other than as represented in Exhibit "A" to the subscription offer. Nothing supports the bald assertions in their briefs that there existed a liability from Arden Partnership to Guyer and Hodges or that they transferred less than all of the assets to Arden Corporation. Moreover, petitioners did not even attempt to prove at trial the specific factual allegations in their petitions to this Court. Both petitioners Guyer and petitioners *448 Hodges alleged as a fact that Guyer and Hodges retained ownership of certain accounts receivable of Arden Partnership. Yet petitioners offered not one word of testimony or other evidence in support of these allegations. Indeed, the accounts receivable of Arden Partnership were not even mentioned by any of petitioners' witnesses at trial. Petitioners' allegation of a specific, determinative fact in their petitions coupled with their totally ignoring this alleged fact at trial undermines the credibility of their present contentions with respect to the transaction in issue. Petitioners cite Makover v. Commissioner,T.C. Memo. 1967-53, and Hartley v. Commissioner,T.C. Memo. 1967-38, in support of their position herein. Like the present case, those cases presented a purely factual question, and our findings of fact were dispositive of the issue. In both Makover and Hartley, we concluded that the taxpayers did not receive "other property" taxable under section 351(b), as a result of the taxpayers' withholding accounts receivable from the newly formed corporations and subsequently lending funds to the corporations in independent transactions. *449 Unlike Guyer and Hodges in the present case, the taxpayers in Makover and Hartley proved specific facts sufficient to establish that the transactions occurred as alleged by the taxpayers. The case now before us is more closely analogous to Battaglia v. Commissioner,T.C. Memo. 1981-451, wherein we concluded: "While petitioner initially indicated a desire to withdraw cash from the partnership and separately loan it to the corporation, no such withdrawal and separate loan were ever accomplished." 42 T.C.M. 817 at 822, 50 P-H Memo T.C. par. 81,451 at 81-1720. Petitioners argue that they are not attempting to avoid taxation, as "[t]he income of the Partnership was charged to Petitioners when it was earned by the Partnership in earlier years." Petitioners further assert that it is inconceivable that their tax advisors "would have allowed the contribution of capital to be made in a manner which would have unnecessarily caused the Petitioners to be subject to double taxation of the same income which would result if the previously taxed partnership capital were again taxed upon distribution." Arden Corporation reported substantial earnings for *450 1977, and petitioners have not established, or even argued, that the distributions to Guyer and Hodges came from the property transferred to Arden Corporation in January and not from corporate earnings during the year. Moreover, the transfer of all of the assets of Arden Partnership to Arden Corporation may have been essential to the generation of those earnings, either as a source of operating capital or as a prerequisite to obtaining Republic's participation in the increased line of credit. Had Arden Corporation realized no profit during 1977, the distributions to the shareholders may not have been possible, in light of the business' capital needs and Republic's credit requirements. In any event, we need not speculate on the above matters. Although section 351 provides for nonrecognition upon the transfer of property to a corporation, section 351 is not a two-way street. Property transferred pursuant to section 351 that is subsequently distributed to the shareholders is subject to the normal corporate distribution rules. The mere possibility that Guyer and Hodges could have structured the transaction differently does not justify our characterizing the transaction other than *451 as effected by them. Guyer Constructive Dividend
Respondent concedes in his brief that, even if the payment of the air charter fee by Arden Corporation constituted a taxable dividend, petitioners were entitled to an offsetting abandonment loss deduction under section 165 for the same amount. Because of respondent's concession, we need not decide the dividend issue. [7]
Arm's Length Rent
Petitioner BHTC leased certain assets from petitioner JHTC and paid to JHTC rents of $988,710 and $1,707,643 during the fiscal years ended June 30, 1977, and June 30, 1978, respectively. Respondent reallocated taxable income between JHTC and BHTC under section 482. Section 482 authorizes the Commissioner to distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among commonly controlled organizations, trades, or businesses to prevent evasion of taxes *452 or to reflect clearly the income of any of such organizations, trades, or businesses. [8] Enacted to prevent evasion of taxes by the arbitrary shifting of income among commonly controlled entities, Ach v. Commissioner,42 T.C. 114, 125 (1964), affd. 358 F.2d 342 (6th Cir. 1966), section 482 places "a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer." Section 1.482-1(b)(1), Income Tax Regs. Thus the applicable standard under section 482 is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Section 1.482-1(b)(1), Income Tax Regs.
*453 Petitioners do not contest the applicability of section 482 to the present case or contend that the 50-percent-of-revenue rental rate provided in the lease agreement constituted an arm's length charge between JHTC and BHTC. Petitioners instead attack the reallocation determined by respondent as arbitrary and capricious. Relying upon the testimony of Lance Johnson (Johnson), who was experienced in the oil field trucking industry, petitioners assert that an arm's length rent payable to JHTC by BHTC was 35 percent of the revenue from the leased assets. Johnson prepared a written report concerning his determination of the arm's length rental charge. In the report, Johnson stated that, in the typical equipment lease used in the oil field trucking industry, the lessor must pay all driver, fuel, and maintenance expenses and receives rent equal to 70 percent of the revenue generated by the equipment. Johnson based his determination that JHTC should receive rent equal to 35 percent of the revenue on two factors: (1) BHTC was to pay driver, fuel, and maintenance expenses and (2) JHTC provided additional assets not provided in the typical industry leasing arrangement. Johnson's report *454 provided no further explanation as to how he calculated the 35 percent figure. In a schedule attached to his report, Johnson listed each asset he believed to be leased by JHTC to BHTC, the asset's original cost basis, and the value of the asset determined by Johnson by reference to third-party appraisals that are not in evidence. The listed assets included 35 trucks, 51 trailers, 21 automobiles and pickup trucks, 2 real property "yards" (consisting of land and improvements), miscellaneous items of equipment, and partial ICC authority. The "yards," equipment items, and ICC authority were the assets that Johnson concluded were not typically provided by lessors in the industry and upon which Johnson relied in determining the 35-percent-of-revenue figure. Johnson testified at trial that he determined that 35 percent of revenue was a fair rental fee to JHTC by first computing "what it would cost BHTC to operate and then receive a fair profit. And therefore the remainder of the 100 percent of gross revenue would be the fair compensation to JHTC." In his brief, respondent argues that an arm's length rent to JHTC was $600,235 per year. Respondent points to the testimony of and a *455 valuation report prepared by his own expert witness, Fred M. Selensky (Selensky). Selensky determined the $600,235 figure by computing the amount necessary to allow JHTC a 12 percent profit after deduction for recovery of asset value (less salvage value) over 5 years, interest of 12 percent on 75 percent of asset value, and actual taxes and license fees paid by JHTC. Selensky's methodology was consistent with that employed earlier by him in computing an arm's length rental value for the purpose of respondent's statutory notices of deficiency (i.e., $409,860 per year). The annual rate of $600,235 was greater than that determined by respondent in the statutory notices because, in computing the $600,235 amount, Selensky utilized the aggregate fair market value of the assets as reported by Johnson, which exceeded the amount used by Selensky in the prior computation. Both petitioners and respondent agree that the arm's lenght rent for the assets leased by JHTC to BHTC should be determined under the standards set forth in section 1.482-2(c), Income Tax Regs. Indeed, all or substantially all the leased assets were tangible property, [9] and section 1.482-2(c)(2) prescribes an "arm's length *456 charge" for the use of tangible property. Yet both petitioner and respondent have apparently ignored a portion of the regulation. As the parties recognize, section 1.482-2(c)(2)(i) defines an "arm's length rental charge" in general as "the amount of rent which was charged, or would have been charged for the use of the same or similar property, during the time it was in use, in independent transactions with or between unrelated parties under similar circumstances * * *." If neither the owner nor the user was engaged in the trade or business of renting similar property to unrelated parties, however, the regulation *457 provides that the arm's length rental charge for the taxable year is deemed to be the amount computed under a specific formula, unless the taxpayer establishes a more appropriate charge under the general standard quoted above. Were the owner of the property is a true owner (as opposed to a sublessor), subdivision (ii) of the regulation prescribes the formula basically as the sum of (1) the cost basis of the property, reduced by estimated salvage value but not by depreciation and similar charges, divided by the useful life of the property; (2) 3 percent of the cost basis of the property, as difined above; and (3) certain expenses paid or accrued by the owner of the property. Nothing in the record indicates that either JHTC or BHTC was engaged in the trade or business of renting similar equipment to unrelated parties. Moreover, petitioners have not demonstrated that the 35-percent-of-revenue charge determined by Johnson is more appropriate than the formula amount under section 1.482-2(c)(2)(ii), Income Tax Regs. Petitioners have not expressly addressed the latter issue, which is not surprising in light of both parties' failure to mention subdivision (ii) of the regulation in their *458 briefs. From the evidence in the record, however, we conclude that the rent determined by Johnson is not more appropriate than the amount computed under the formula. Petitioners defend the 35-percent-of-revenue figure as consistent with the industry practice of computing rent as a percentage of the revenue from the leased assets. Johnson testified that a fixed rental fee, i.e., a fee that does not vary with revenue, would be contrary to the custom of the industry. The simple answer to petitioners' argument is that the lease between JHTC and BHTC was by no means a customary arrangement in the oil field trucking industry. Johnson testified that the typical industry lease, under which the lessor was entitled to 70 percent of the revenue, required the lessor to pay all driver, fuel, and maintenance costs associated with the leased equipment. A veteran of numerous leasing arrangements in the industry, Johnson did not cite a single transaction within his experience or knowledge (other than the present case) in which the lessee was obligated to pay those expenses. Johnson described the lease between JHTC and BHTC as "in certain aspects almost the reverse of what the industry standard *459 is." Although the complete rationale behined the standard rental fee based on revenue is not explicitly set forth in the record, that rationale and its inapplicability to the present case are apparent from the evidence. Johnson testified that the sum of driver, fuel, and maintenance expenses typically equaled 50 to 55 percent of the revenue generated by the leased equipment. A lessor-owner required to pay these variable costs would quite reasonably demand rent computed as a percentage of revenue. Otherwise, the lessee-user of the equipment would realize all of the increased revenue resulting from increased usage, but the lessor would bear all of the associated increased costs. Because presumably the level of usage would be within the control of the lessee, a variable rental charge is essential under the typical leasing arrangement. Where, as in the present case, however, the lessor bears only the fixed costs associated with the investment in the assets, a fixed rental charge allowing the lessor to recover those fixed costs plus a profit would appear to be more appropriate. Determining such a rental charge is indeed the intent behind the formula prescribed in section 1.482-2(c)(2)(ii), *460 Income Tax Regs. See Fegan v. Commissioner,71 T.C. 791, 812 (1979), affd. without published opinion (10th Cir., April 27, 1981, 81-1 USTC par. 9436). Johnson did not indicate why he believed that the typical industry practice of calculating rent as a percentage of revenue should apply to the atypical arrangement involved herein. The record and the obvious inferences therefore indicate that it should not. We therefore direct the parties to determine in relation to the Rule 155 Computation the arm's length rental charge between JHTC and BHTC in accordance with the formula in subdivision (ii) of the regulation. One final issue remains with respect to the assets leased by JHTC to BHTC. Petitioners contend that the leasing arrangement commenced on December 15, 1976, the date BHTC acquired JHTC. Respondent argues that February 17, 1977, the effective date of the lease contract, constituted the beginning of the lease. We conclude that petitioners have not satisfied their burden of proof. The only evidence relied upon by petitioners with respect to this issue is the following testimony of Holmes (Hodges' accountant): Q. Do you have any independent *461 recollection of when Bill Hodges Truck Company took the assets from Jack Hodges Truck Company and commenced operations in this business? A. Yes. Q. What is that independent recollection? A. The independent recollection is that the deal had to be consummated by midnight on December 15, 1976. It was imperative to J. D. Hodges and his in-house accountant that they get the deal consummated by then because of certain requirements pertaining to Subchapter S elections. Q. How did the deal get consummated on December 15, 1976? A. It was consummated by going to Fidelity Bank, getting all of the documents signed and the money changing hands. Q. After consummation of the transaction, to your knowledge, did Bill Hodges Truck Company take possession and usage of the assets that were owned at that time by Jack Hodges Truck Company? A. Yes. They took possession at midnight that night. Holmes' testimony proves only that BHTC completed its acquisition of JHTC on December 15, 1976. His description of the arrangement regarding the assets of JHTC was neither clear nor specific. Petitioners apparently interpret Holmes' testimony extremely literally and outside the context of *462 the acquisition. One could employ an interpretative approach similar to that utilized by petitioners and conclude that the acquisition was not a stock purchase but an asset purchase, a conclusion not urged upon us by petitioners and not valid in fact. An acquiring corporation "taking possession of and using" the assets of its newly acquired subsidiary is consistent both with the use of the assets in the parent's business and with use in the subsidiary's business. Moreover, the mere use of the assets in the parent's business does not establish the existence of a rental arrangement. Nothing in Holmes' testimony or elsewhere in the record indicates that BHTC began using the assets of JHTC in BHTC's business under a rental transaction as of December 15, 1976. The lease contract executed by JHTC and BHTC stands in stark contrast to the dearth of evidence submitted by petitioners on this issue. The contract provided that the lease term began on the effective date, February 17, 1977; contained no reference to a prior rental arrangement; and stated that it contained "all of the agreements between the parties." We see no reason to find otherwise. Gain on Sale of Assets
Petitioner *463 BHTC acquired all of the stock of Pinkley and merged Pinkley into BHTC. At the time of the acquisition, both Pinkley and BHTC treated the transaction as a tax-free reorganization for Federal income tax purposes. Petitioner now contends that the acquisition of Pinkley's assets should have been reported as a liquidation to which section 334(b)(2) applied. [10] Petitioner thus argues that its original bases in the assets acquired from Pinkley should have been determined by allocating the aggregate purchase price of Pinkley among those assets. [11] The regulations under section 334(b)(2) generally require allocation in proportion to the fair market values of the acquired assets. See section 1.334-1(c)(4)(viii), Income Tax Regs.
*464 Respondent concedes in his brief that the acquisition constituted a liquidation to which section 334(b)(2) should apply. He nevertheless contends that "[p]etitioner has no basis upon which to make a section 334(b)(2) allocation since the testimony of petitioner's witness, Dunn, is conjectural in that it is based upon third party opinions and facts of which Dunn has no personal knowledge." According to respondent, "the admission in evidence of the schedule allegedly prepared by Dunn * * * was in error due to its being based solely upon hearsay evidence, and * * * respondent's determination should be sustained." In response to respondent's argument, petitioner asserts that our admission of Dunn's work sheets into evidence was proper under Rule 703, Federal Rules of Evidence.
Dunn described at trial the asset value figures relied upon by him in performing the allocation required by section 334(b)(2) and the regulations thereunder as follows: Q. In forming your opinion as indicated in this exhibit, what materials did you rely upon? A. There were, first of all, the work sheets here were prepared by * * * [petitioner's attorney], and in addition, *465 during the course of this case, we obtained, my client, Bill Hodges Truck Company obtained various appraisals from primarily EBCO and Bodnar, I forget the name of the second appraiser who appraised the permit, the operating authority. But basically, the fixed assets, the hard assets, the appreciable [sic] assets, the appraisals were taken from the EBCO appraisal. And with that appraisal we then attempted to, or * * * [petitioner's attorney] and with my assistance prepared this schedule. The appraisal reports upon which Dunn relied are not part of the record herein, and the preparers of those reports did not testify at trial. The respective fair market values of the assets, not the mechanical allocations performed by Dunn based on assumed values, are the material facts that petitioner must establish to prove its bases in the assets. The record contains absolutely no evidence that the values used by Dunn were correct. Petitioner's attorney stated at trial that petitioner had furnished respondent with the appraisals relied upon by Dunn. Petitioner also mailed copies of the appraisal reports to the Court less than two weeks prior to trial. Such actions obviously do not *466 satisfy petitioner's burden of producing evidence at trial through appropriate witnesses. As the predecessor to this Court stated soon after its inception: This Board is required by law to make findings of facts. Such findings can not be made upon conjecture, ex parte statements, or argument. They must be supported by evidence presented to the Board. What has been submitted to or considered by the Bureau of Internal Revenus is beyond the ken of this Board. This body * * * has no connection with the Bureau of Internal Revenue, and evidence that has been introduced before any other department of the Government must be reintroduced before this Board before we can consider it. [Lyon v. Commissioner,1 B.T.A. 378, 379 (1925).] [12]
*467 Again petitioners have failed to prove the facts necessary to their position, in this instance the relative fair market values of the acquired assets. Hodges Constructive Dividend
BHTC charged to "Accounts Receivable Officer - Harold L. Hodges" $22,848 during 1976 and $217,895.55 during 1977 for amounts advanced (in cash or the payment of personal expenses) to co-petitioner Hodges. Respondent determined that these amounts, less a $50,000 credit to the receivable in 1977, constituted taxable dividend income to petitioners. Petitioners argue that the amounts recorded in the account receivable represented loans to Hodges from BHTC. Whether the advances from a corporation to its shareholder constitute bona fide loans is a factual question and depends upon the existence of an intent on the shareholder's part to repay the advances and an intent on the corporation's part of enforce the obligations, at the time the advances occurred. Pierce v. Commissioner,61 T.C. 424, 430 (1974), and cases cited therein. The issue thus turns upon all of the circumstances surrounding the transactions. Roschuni v. Commissioner,29 T.C. 1193, 1201-1202 (1958), *468 affd. per curiam 271 F.2d 267 (5th Cir. 1959). Where the shareholder receiving the advances controls the corporation, we must carefully scrutinize the transactions. Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). In determining whether the shareholder and the corporation possessed the requisite intention at the time of the advances, the court have examined a number of factors, including the following: whether the parties executed notes; whether the asserted obligations were secured by collateral; whether there existed a fixed schedule for repayment; whether interest was paid or accrued; whether the shareholder repaid any part of the advances; whether the shareholder had the ability to repay the advances; how the parties treated the advances on their books and records; whether there existed a specific business purpose for the advances; whether the corporation had a history of paying dividends; whether the corporation had earnings and profits available to pay dividends; and whether advances to shareholders were made in proportion to their shareholdings. See, e.g., Dolese v. United States,605 F.2d 1146, 1153 (10th Cir. 1979); *469 Alterman Foods, Inc. v. United States,505 F.2d 873, 876 n. 6 (5th Cir. 1974); Berthold v. Commissioner,404 F.2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Pierce v. Commissioner,supra.
Because of the nature of this issue, the above factors are by no means exclusive, and none is determinative. The factors merely represent objective evidence helpful to the courts in analyzing all of the relevant facts and circumstances. Based on our consideration of the entire record, we conclude that petitioners have not proven that Hodges possessed an intention to repay the 1976 and 1977 advances at the time they occurred. Petitioners rely most heavily upon Hodges' uncontroverted testimony that he intended to repay every advance received from BHTC and the recording of the advances as accounts receivable by BHTC. We believe that the analysis of the Sixth Circuit Court of Appeals in Berthold v. Commissioner,supra, is an appropriate response to petitioners' arguments: We note that Berthold testified directly on the critical issue of intent. He said that the $54,498.18 advanced was intended *470 as a loan and was intended to be repaid. Such subjective testimony, however, can be technically true and still not controlling on the finder of the facts in this case. In this case "the parties" are really one and the same. * * * We have no doubt that taxpayers did intend the advances to be a loan--at least for federal tax purposes. But such testimony (pertaining to transactions between a taxpayer and two of his alter egos) can appropriately be viewed with some diffidence unless supported by other facts which bring the transaction much closer to a normal arm's-length loan. Nasser v. United States,257 F.Supp. 443 (N.D.Cal. 1966). The intention of the parties relates not so much to what the transaction is called, or even what form it takes, as it does to an actual intent that money advanced will be repaid. Commissioner of Internal Revenue v. Makransky,321 F.2d 598 (3d Cir. 1963). Normal security, interest and repayment arrangements (or efforts to secure same) are important proofs of such intent. And here such proofs are notably lacking. [404 F.2d at 122.] In Williams v. Commissioner,627 F.2d 1032, 1034 (10th Cir. 1980), *471 affg. a Memorandum Opinion of this Court, the Tenth Circuit Court of Appeals, the court to which this case is appealable, reached a similar conclusion: At the most, the mentioned testimony shows a subjective intent of the taxpayers to repay. A declared intent to repay is insufficient if it fails to jibe with the undisputed facts indicating the intrinsic economic nature of the transaction. Fin Hay Realty Co. v. United States, 3 Cir., 398 F.2d 694, 697, and Alterman Foods, Inc. v. United States, 5 Cir., 505 F.2d 873, 877. The self-serving declarations must be balanced against the surrounding circumstances. As indicated by the brevity of our findings of fact on this issue, the record herein contains very little relevant documentary evidence in support of Hodges' testimony. Petitioners argue, and Holmes testified, that BHTC periodically reclassified the alleged indebtedness represented by the account receivable to notes receivable and that such notes receivable were reflected in actual interest-bearing notes. Petitioners also assert that Hodges periodically made payments on these "notes." Despite petitioners' assertions, the record is virtually *472 devoid of evidence supporting Hodges' and Holmes' testimony, although such evidence, if it existed, should have been readily available to petitioners. The only evidence illustrating the activity in the "Accounts Receivable Officer" account was a page from BHTC's general ledger for the period April 1974 through June 1974, well prior to the years (and the advances) in issue. [13] Although the ledger indicated that most of the balance in the account was eliminated by a credit entry of $440,000 in June 1974, nothing indicated the reason for the entry or the account receiving the corresponding debit. Petitioners introduced no documentary evidence with respect to the alleged notes receivable account, and their counsel stated at trial that petitioners could not locate the notes allegedly executed by Hodges and BHTC. *473 We similarly can find little reliable evidence that Hodges actually made periodic payments on the asserted indebtedness subsequent to the years in issue. Petitioners produced a check payable to BHTC for $65,000 that was dated August 3, 1978, drawn on Arden Corporation, and signed by Guyer, and that bore the notation "Note in Full." Without the underlying account records, however, we are not persuaded that the referenced "Note" was a note receivable from Hodges or that it was related to the items in the "Accounts Receivable Officer." Petitioners did introduce Hodges' personal check payable to BHTC for $607,103.42, dated December 12, 1980, and the associated journal entry from the financial records of BHTC.That entry included credits to the account receivable, to accrued interest, and to a note receivable from Hodges in the amounts of $96,973.63, $140,129.79, and $350,000.00, respectively. Hodges stated that the funds for this check came from the sale of his stock in Arden Corporation. While such a documented repayment of a shareholder's advances might in other circumstances be persuasive evidence that the advances were bona fide loans, it is inconclusive here. Respondent's revenue *474 agent completed his examination of petitioners' income tax returns for the years 1976 and 1977 in 1979 and submitted his report in early 1980. The payment in December 1980 may thus represent an attempt by Hodges to strengthen petitioners' position in the imminent controversy instead of a reflection of Hodges' intention at the time of the advances in issue. See Williams v. Commissioner,627 F.2d at 1034-1035 (10th Cir. 1980). Moreover, petitioners presented no evidence indicating that Hodges could have repaid the advances absent the sale of his interest in Arden Corporation or that he could have foreseen such sale at the time of the advances. Cf. Dolese v. United States,605 F.2d 1146, 1153-1154 (10th Cir. 1979). Petitioners have thus tendered a variety of weak indicia of an intent to repay under circumstances in which stronger evidence should be available to them. Negative inferences are thus justified. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947); Woods v. Graf,84 F.Supp. 893 (N.D. N.Y. 1949). Considering the entire record, *475 we conclude that petitioners have proven little more than the classification of the advances as accounts receivable by BHTC. No other objective manifestations of contemporaneous intent to repay have been established. Petitioners have not demonstrated that the advances were represented by interest-bearing notes or that Hodges periodically repaid principal and interest. The advances to Hodges presumably were unsecured and were not subject to a fixed repayment schedule.[14] Because Hodges was the sole shareholder of BHTC, the advances were in proportion to his holdings. The corporation had substantial earnings, and nothing indicates that BHTC otherwise paid dividends. [15] See Roschuni v. Commissioner,29 T.C. 1193, 1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959). Based upon all of the evidence before us (and the lack thereof), we conclude that petitioners have not satisfied their burden of proof on this issue. *476 We have considered the other arguments of the parties and find them untimely or unpersuasive. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Jack Hodges Trucking Co., docket No. 13289-82; Bill Hodges Truck Co., Inc., docket No. 13290-82; Harold L. Hodges and Judy L. Hodges, docket No. 13291-82; and Bill Hodges Truck Co., Inc., docket No. 13292-82.↩
2. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. Although we presume that ITT was International Telephone and Telegraph, the record does not so indicate.↩
4. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR. (a) General Rule.--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. (b) Receipt of Property.--If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then-- (1) gain (if any) to such recipient shall be recognized, but not in excess of-- (A) the amount of money received, plus (B) the fair market value of such other property received; and (2) no loss to such recipient shall be recognized.↩
5. The subscription offer, including Exhibit "A," consisted of two pages that were stapled together with a third page entitled "WAIVER OF NOTICE OF ORGANIZATIONAL MEETING OF THE INCORPORATORS AND SUBSCRIBERS OF ARDEN DRILLING COMPANY." Although the signatures of Guyer and Hodges were not present on either of the first two pages, both Guyer and Hodges signed the third page under the caption "SUBSCRIBER." ↩
6. The only evidence on whether the board formally accepted the subscription offer was the following testimony of Hines: Q. Now, also, Sir, the subscription, the first page of this subscription to common shares indicates that this is an offer from the undersigned which may be accepted by the board of directors of Arden Drilling Company. Are you aware from your knowledge, Sir, whether that offer was accepted? A. Do you mean in writing -- Q. Yes, Sir. A. -- or did the corporation accept the offer, that the board did? I believe the minutes reflect that. Q. Do you know from your knowledge, though, Sir? A. Show me the minute book.No, I do not know, I didn't actually witness it, no. [Emphasis supplied.] In any event, it was up to petitioners to show that the offer was not accepted expressly or by implementation of its terms.↩
7. The record indicates that Arden Corporation reported the air fare payment as a section 162 deduction and that respondent denied the deduction under the constructive dividend theory. Arden Corporation is not a petitioner in this case, however, and its tax liability is not in issue herein.↩
8. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
9. The record does not indicate how Johnson ascertained the various assets leased to BHTC that were not specified in the February 17, 1977 lease contract. Johnson testified that petitioners' attorney informed him of the ICC authority, the only intangible asset listed by Johnson in his report. Despite the absence of evidence in the record, respondent apparently does not dispute that all of the assets listed by Johnson were actually leased to BHTC, as is manifested by respondent's reliance upon Selensky's report utilizing the total asset value reported by Johnson.↩
10. Section 334(b)(2) provides that a parent corporation obtains an aggregate basis in the assets received upon liquidation of a subsidiary equal to the purchase price of the subsidiary, if certain conditions are satisfied. In the Tax Equity and Fiscal Responsibility Act of 1982, Congress replaced sec. 334(b)(2) as effective during the years in issue with a similar provision in sec. 338. See Pub. L. 97-248, sec. 224, 96 Stat. 324, 485-488. ↩
11. Petitioner admits that treating the transaction in this manner at the time of the acquisition would have necessitated substantial depreciation and investment tax credit recapture by Pinkley upon liquidation.↩
12. Respondent also argues that, under both the tax benefit rule and the duty of consistency doctrine, "petitioner ought not be entitled to avail itself of the tax benefits resulting from the section 334(b)(2) step-up of basis." He further moves that, if we hold for petitioner on this issue, the record be reopened to allow respondent to introduce evidence of the values of the acquired assets.In light of our holding, we need not address these arguments.↩
13. Petitioners attempted to introduce a summary of the activity in the account, which the Court rejected as lacking foundation in the absence of petitioners' producing the underlying records. Petitioners offered no reason for failing to produce the actual records, except for their counsel's statement at trial that the records were too voluminous. Yet the record of the account receivable for April through June 1974 represented only one-half of a page from the general ledger of BHTC. The few partial records produced strongly suggested that the summary was unreliable. See United States v. Kim,595 F.2d 755 (D.C. Cir. 1979); Fed. R. Evid. 803(6), 1006↩.
14. Hodges testified: "Well, my intention was that I would build up enough oil and gas income coming in to pay the notes off." ↩
15. Petitioners' income tax returns for 1976 and 1977 did not report any dividend income from BHTC.↩